Approved: _____
Sarah Lai/Olga I. Zverovich/Andrew Chan
Assistant United States Attorneys

Before:   THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

**23 MAG 2234**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

CHARLES RILEY CONSTANT,
   a/k/a "Chuck Constant,"

                                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 2, 641, 1956(a)(1)(B)(i), 1956(h), 1957, and 2315

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

JASON S. SAMUELS, being duly sworn, deposes and says that he is a Special Agent with U.S. Department of Homeland Security, Homeland Security Investigations, and charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Money Laundering)**

1. From at least in or about June 2020, through in or about August 2020, in the Southern District of New York and elsewhere, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), to wit, CONSTANT and others conspired to launder proceeds of, and to engage in monetary transactions of more than $10,000 using proceeds derived from, COVID-19 relief fraud against the U.S. Small Business Administration by using an entity named C2 LLC, among other entities, to broker the exchange of fraud proceeds for bitcoin.

2. It was a part and object of the conspiracy that CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole or in part to conceal and

disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

3. It was a further part and object of the conspiracy that CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1957.

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO
### (Theft of Public Money)

4. From in or about August 2020, up to and including in or about December 2021, in the Southern District of New York and elsewhere, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, embezzled, stole, purloined, and knowingly converted to his use and the use of another, and without authority, sold, conveyed and disposed of a record, voucher, money, and thing of value of the United States and of any department and agency thereof, and property made and being made under contract for the United States and any department and agency thereof, to wit, CONSTANT stole, spent, and otherwise disposed of over $300,000 derived from COVID-19 relief fraud against the U.S. Small Business Administration.

(Title 18, United States Code, Sections 641 and 2.)

## COUNT THREE
### (Receipt of Stolen Moneys)

5. From in or about July 2020, up to and including in or about December 2021, in the Southern District of New York and elsewhere, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, knowingly received, possessed, concealed, stored, bartered, sold, and disposed of goods, wares, and merchandise, securities, and money of the value of $5,000 and more, and pledged and accepted as security for a loan goods, wares, and merchandise, and securities of a value of $500 and more which had crossed a State or United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken, to wit, CONSTANT received, spent, and otherwise disposed of over $1 million derived from fraud against the U.S. Small Business Administration.

(Title 18, United States Code, Sections 2315 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

6. I am a Special Agent with Homeland Security Investigations ("HSI") of the U.S. Department of Homeland Security, assigned to a Financial Crimes Group. I have

received training and have participated in investigations of financial crimes, including crimes involving cryptocurrency. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## THE SBA's ECONOMIC INJURY DISASTER LOAN PROGRAM

7. Based on my training, experience, review of information from the SBA's website, and communications with U.S. Small Business Administration ("SBA") representatives, I know that:

   a. The SBA is a federal agency that administers assistance to American small businesses. Of relevance here, this assistance includes making direct loans to applicants through the Economic Injury Disaster Loan ("EIDL") program.

   b. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law which was enacted on March 29, 2020, and was designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic. Among other things, the CARES Act expanded the SBA's EIDL program to provide small businesses with low-interest loans of up to $2 million prior to in or about May 2020, and up to $150,000 between in or about May 2020 and in or about December 2021, in order to provide vital economic support to help overcome the loss of revenue that small businesses experienced due to the COVID-19 pandemic. These loans were made directly by the SBA.

   c. To qualify for an EIDL under the CARES Act, an applicant must have suffered "substantial economic injury" from COVID-19, based on an actual economic injury determined by the SBA. EIDLs could only be used for specified purposes, such as payroll, increased costs due to supply chain interruption, obligations that could not be met due to revenue loss, and other similar expenses.

## RELEVANT INDIVIDUALS AND ENTITIES

8. Based on my review of the contents of two Apple iCloud accounts and a cellular telephone, all seized and searched pursuant to judicially authorized search warrants; records from multiple banks and cryptocurrency exchanges; and records maintained by the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"); as well as my communications with FinCEN representatives, among other things, I am aware of the following:

   a. At all times relevant to this Complaint, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, was a resident of Texas and the principal of entities named C2 LLC ("C2") and Coindawg LLC ("Coindawg"). CONSTANT maintained

a personal account at a certain cryptocurrency exchange headquartered in California ("Exchange-1"), associated with User ID 0c66 ("Constant's Exchange-1 Account").

    b. C2 was a Wyoming company that was created in or about December 2018, and registered as a money services business ("MSB") with FinCEN from in or about May 2019 to in or about May 2021.  C2's MSB registration expired after in or about May 2021, but C2 continued to operate as an MSB.  Through C2, CONSTANT facilitated the exchange of fiat currency for cryptocurrency, among other services.  At various times relevant to this Complaint, C2 held accounts at a certain bank headquartered in North Carolina ("Bank-1"), with account numbers ending in 9705 and 9580 (the "C2-9705 Account" and the "C2-9580 Account," respectively; together, the "C2-Bank-1 Accounts"), and another bank headquartered in Louisiana ("Bank-2"), with account number ending in 8750 (the "C2-8750 Account"; collectively, the "C2 Accounts"), among other banks.  CONSTANT was the sole signatory on each of C2 Accounts.

    c. Coindawg was a Wyoming company, created in or about October 2020, that operated cryptocurrency automated teller machines ("Crypto ATMs") in Texas and Oklahoma.  At various times relevant to this Complaint, Coindawg maintained accounts at:  a bank headquartered in Mississippi ("Bank-3") with account number ending in 5403 (the "Coindawg-5403 Account"); and Exchange-1, associated with User ID ending in bc85 ("Coindawg's Exchange-1 Account"; collectively, the "Coindawg Accounts").  CONSTANT was the sole signatory on each of the Coindawg Accounts.

    d. A co-conspirator not charged as a defendant herein ("Sellers' Broker-1") was an individual who offered "over-the-counter," or "OTC," cryptocurrency trading services to customers.  Based on my training and experience, I know that, in the cryptocurrency context, OTC trading typically refers to the trading of fiat currency for cryptocurrency, or one form of cryptocurrency for another form of cryptocurrency, directly between two parties.  Of relevance here, Sellers' Broker-1 represented cryptocurrency sellers.

    e. Another co-conspirator not charged as a defendant herein ("Sellers' Broker-2"; together with CONSTANT and Sellers' Broker-1, the "Sellers' Group") was also a cryptocurrency broker.  Of relevance to this Complaint, Sellers' Broker-2 was an intermediary between Sellers' Broker-1 and CONSTANT.

    f. A third co-conspirator not charged as a defendant herein ("Buyers' Broker-1") was also a cryptocurrency broker.  Buyers' Broker-1 represented other co-conspirators not named as defendants herein wishing to buy cryptocurrency with proceeds of criminal activity.  Of relevance here, Buyers' Broker-1 represented a buyer with access to proceeds of fraud against the SBA in or about July 2020 (the "Buyer"; together with Buyers' Broker-1, the "Buyer's Group").

    g. Each of the brokers received and expected to receive a commission that was a percentage of the value of each OTC transaction they facilitated.

    h. At all times relevant to this Complaint, a certain company headquartered in Manhattan, New York, and another company headquartered in Australia were

financial services companies specializing in digital assets ("Exchange-2" and "Exchange-3, respectively). Both exchanges offered cryptocurrency exchange services to certain clients. Exchange-3 maintained an account at a certain bank in Manhattan, New York ("Bank-4").

## OVERVIEW

9. As detailed below, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, assisted others involved in a scheme to obtain over $1 million in fraudulent SBA loans to launder the proceeds of those fraudulent loans through cryptocurrency transactions. CONSTANT laundered approximately $700,000 of the fraud proceeds back to those who perpetrated the SBA fraud scheme, and then stole the remaining $300,000, which he used, among other things, to start his own cryptocurrency ATM business, Coindawg.

10. In or about July 2020, Buyers' Broker-1 approached Sellers' Broker-1 online regarding a client (the Buyer) who was seeking to buy bitcoin over the counter. Sellers' Broker-1, in turn, contacted Sellers' Broker-2 to secure a source of bitcoin. Sellers' Broker-2 then contacted CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, who had existing accounts with Exchange-2 and Exchange-3. Buyers' Broker-1 was not informed that the Sellers' Brokers would be using these Exchanges to source their bitcoin. Between on or about July 8, 2020, and July 13, 2020, the Buyer's Group caused seven fraudulently obtained EIDLs (the "Fraudulent SBA Loans"), totaling $1,049,300, to be transferred from the SBA to the C2-9705 Account that CONSTANT controlled.[1] Each of those loans was issued to a purported farm (collectively, the "Purported Farm Borrowers"). Upon receipt, CONSTANT immediately moved a portion of the Fraudulent SBA Loans from the C2-9705 Account to the C2-9580 Account. Between on or about July 8, 2020, and July 13, 2020, CONSTANT successfully laundered a total of nearly $700,000 from the Fraudulent SBA Loans, or over 66% of the loan proceeds, by transferring the funds from the C2-Bank-1 Accounts to Exchange-2 and Exchange-3 for the purchase of bitcoin. During that same period, at CONSTANT's direction, Exchange-2 and Exchange-3 sent a combined total of approximately 74.6569 BTC, equivalent to approximately $697,770, to a bitcoin wallet controlled by Sellers' Broker-2. In turn, Sellers' Broker-2 transferred approximately 70.7352 BTC, equivalent to approximately $660,460, to a bitcoin wallet designated by the Buyer's Group.

11. CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, then stole the remaining approximately $300,000, and used a portion of the money he stole to start Coindawg, including buying Coindawg's Crypto ATMs.

12. By routing the Fraudulent SBA Loans through the C2-Bank-1 Accounts and, later, the Coindawg accounts, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant" the defendant, concealed from the Exchanges and others the fact that the proceeds of the Fraudulent SBA Loans were being used to purchase cryptocurrency, primarily bitcoin, and Crypto ATMs, among other uses.

---

[1] Each loan was for $150,000. However, a $100 administrative fee was deducted from each loan, such that $149,900 from each loan was deposited into the C2-9705 Account.

## THE SCHEME TO LAUNDER FRAUDULENT SBA LOAN FUNDS

13. Based on my review of WhatsApp messages from a cellphone used by Sellers' Broker-2 ("Sellers' Broker-2's Phone") and an iCloud account registered to "Chuck Constant" ("Constant's iCloud Account"), which were seized and searched pursuant to judicially authorized search warrants, and records from Bank-1 and Exchange-2, I have learned the following:

  a. In or about late June 2020, Sellers' Broker-2 sent a message to CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, regarding an opportunity to facilitate a bitcoin transaction for Sellers' Broker-1, with whom Sellers' Broker-2 had prior dealings. Approximately one week later, on or about July 1, 2020, CONSTANT opened the C2-9580 Account at Bank-1.

  b. The following day, on or about July 2, 2020, Sellers' Broker-2 forwarded to CONSTANT a message from Sellers' Broker-1, which read, in substance and in part: "$300k going to Chuck [Bank-1] account."[2] On or about July 8, 2020, the C2-9705 Account at Bank-1 received two ACH transfers totaling $299,800 ($300,000 minus $200 in transaction fees), representing the first two Fraudulent SBA Loans. Immediately prior to these deposits, the balance in the C2-9705 Account was approximately $265. That same day, CONSTANT texted Sellers' Broker-2, in substance and in part: "Working w [Bank-1]. Is there a small amount that can be held back so the wire in doesn't exactly match the wire out." Sellers' Broker-2 responded, "Yes hold back 15-20K." Based on my training, experience, and participation in this investigation, I believe that CONSTANT was asking Sellers' Broker-2 if CONSTANT could retain a small portion of the two ACH transfers in the C2-9705 Account to avoid alerting the bank's anti-money laundering department.

  c. On or about the same day, July 8, 2020, CONSTANT made two online transfers from the C2-9705 Account to the C2-9580 Account, in the amounts of $145,000 and $149,900, respectively. Immediately prior to those transfers, the C2-9580 Account had a balance of approximately $230. CONSTANT then wired approximately $281,370 from the C2-9580 Account to Exchange-2. That same day, at CONSTANT's direction, Exchange-2 sent approximately 29.8318 BTC, equivalent to approximately $280,860, to a bitcoin wallet controlled by Sellers' Broker-2 ("Sellers' Broker-2's Wallet"). In turn, Sellers' Broker-2 sent approximately 29.2063 BTC, equivalent to around $275,680, to a wallet designated by Buyers' Broker-1 ("Buyers' Broker-1's Wallet"), thereby completing the laundering of the first two Fraudulent SBA Loans. Later that day, Sellers' Broker-2 sent CONSTANT a WhatsApp message that read: "Now that's how it's done! Clean and Easy!"

  d. The following day, on or about July 9, 2020, Sellers' Broker-2 forwarded to CONSTANT another message from Sellers' Broker-1, which read, "Supposedly, $150k was sent or will be sent today with an addition $600k being sent tomorrow[.]" That day, the C2-9705 Account in fact received another $149,900, representing the third Fraudulent SBA Loan. The next day, CONSTANT transferred $143,900 to the C2-9580 Account.

---

[2] All typographical and grammatical errors in the messages quoted herein are from the original.

     e. On or about July 13, 2020, CONSTANT texted Sellers' Broker-2 a screenshot confirming receipt of another four ACH transfers of $149,900 each, for a total of $599,600, in the C2-9705 Account. As he did before receiving the first three Fraudulent SBA Loans, CONSTANT asked Sellers' Broker-2, in substance and in part: "of the 600k, how much do you want me to retain at BofA for seasoning?" Based on my training, experience, and participation in this investigation, and as discussed in Paragraph 13(b) above, I believe that "seasoning" referred to keeping a portion of the funds in the account, instead of transferring the entire $599,600 immediately to another account, to avoid triggering an anti-money laundering review.

     f. Between on or about July 10, 2020, and July 13, 2020, CONSTANT transferred from the C2-Bank-1 Accounts a total of approximately $387,900 to Exchange-2 and approximately $127,400 to Exchange-3's Bank-4 account in Manhattan for the purchase of bitcoin. Subsequently, at CONSTANT's direction, Exchange-3 returned approximately $100,000 from its Bank-4 account to the C2-9580 Account.

     g. On or about July 13, 2020, at CONSTANT's direction, Exchange-2 sent approximately 41.8866 BTC, equivalent to approximately $389,900, to Sellers' Broker-2's Wallet. And on July 13 to 14, 2020, Sellers' Broker-2 sent a total of approximately 41.5289 BTC, equivalent to approximately $384,700, to Buyers' Broker-1's Wallet.

     h. In summary, by in or about mid-July 2020, CONSTANT had sent, through Sellers' Broker-2, a total of approximately $660,400's worth of bitcoin to Buyers' Broker-1 that had been purchased with the Fraudulent SBA Loans. In addition, CONSTANT caused to be transferred more than $37,700's worth of bitcoin to Sellers' Broker-2 as commission. The balance remained in various C2 Accounts until in or around September 2020.

   14. Based on my review of a recorded call produced by Bank-1, I know that on or about July 14, 2020, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, called Bank-1 seeking information about the last four ACH transfers from the SBA. During that call, a Bank-1 representative informed CONSTANT of the following:

     a. The ACH transfers were EIDLs administered by the SBA, specific to the "Paycheck Protection Program" under the "CARES Act."

     b. Bank-1 did not have access to SBA data that would identify the loan applicants, but asked if CONSTANT had gotten loans for four companies. CONSTANT responded, "Yes."

     c. CONSTANT could call a certain SBA telephone number for further information about the loans.

   15. Based on my review of WhatsApp messages from Sellers' Broker-2's Phone, Constant's iCloud Account, and an iCloud account used by Sellers' Broker-1, I have learned that:

     a. On or about July 15, 2020, after having already transmitted, or caused to be transmitted, over $660,400 to Buyers' Broker-1, CHARLES RILEY CONSTANT,

a/k/a "Chuck Constant," the defendant, sent Sellers' Broker-2 three "Purchase Confirmation Orders" between C2 as the seller of bitcoin, and a certain company ("Company-1") as the buyer. The Purchase Confirmation Orders covered a total of approximately $719,100. Based on my participation in this investigation, including my review of other WhatsApp messages, I believe the Purchase Confirmation Orders were part of an attempt to use false documents to legitimize the bitcoin transactions that CONSTANT had arranged for the Buyer. I further believe CONSTANT understood that Company-1, for which he already had know-your-customer ("KYC") documentation from a prior unrelated transaction with Sellers' Broker-2, was not the true Buyer.

          b.      On or about July 16, 2020, CONSTANT informed Sellers' Broker-2, in substance and in part, that future "ACH/Wires need to come from [Company-1] or whomever else we have CIS/KYC for. Not the SBA." Based on my training, experience, and participation in this investigation, I believe that CONSTANT was concerned that money originating from the SBA intended for COVID-19 relief was being deposited into C2's accounts and instead wanted the funds to appear to originate from a company for which he and Sellers' Broker-2 already had KYC documentation.

          c.      On or about July 17, 2020, instead of returning a completed account application for Company-1, Sellers' Broker-2 instead sent CONSTANT partially completed C2 account applications and supporting documents for four different companies (collectively, the "Purported C2 Account Applicants") that the Buyer's Group provided. None of the Purported C2 Account Applicants was Company-1 or any of the Purported Farm Borrowers.

          d.      On or about July 20, 2020, CONSTANT complained to Sellers' Broker-2 about the documents provided by the Buyer's Group for the Purported C2 Account Applicants:

> This is only part of it. Come on folks. We have to connect the Articles of Association, which states who owns the company and can sign for the company. Then connect that company to the respective loan number. This is basic Corp info. It's what we got for [Company-1] and [a company owned by Sellers' Broker-2]. If owners are different than signers, we need a board resolution showing who can sign and that being the person making these trades.

          e.      On or about July 23, 2020, after several days of being told by Sellers' Broker-1 that the balance of the last four Fraudulent SBA Loans had not yet cleared, the Buyer's Group began to suspect that the Seller's Group was stealing the remaining SBA funds. Sellers' Broker-2 therefore asked CONSTANT:

> CAn you please send over something from [Bank-1] showing that the funds are blocked/on hold. Getting pressure from the buyers side.

After a further exchange, CONSTANT responded:

> I'm not playing those games. The money has[n']t moved, it's not
> at risk, but is not going g [sic] anywhere but back to the SBA if we
> don't shore up the paperwork.

        f.    Approximately one week later, on or about July 31, 2020, Sellers' Broker-1 forwarded to Sellers' Broker-2 a message from the Buyer's Group, stating, in substance and in part, "we will not provide those documents" that CONSTANT had requested, and "I'll rather have your seller send funds back." Based on my participation in this investigation, I believe that the Buyer's Group was refusing or unable to provide the KYC documents that CONSTANT had requested, as discussed in Subparagraph (d) above, and wanted the balance of the Fraudulent SBA Loans to be returned to the Buyer.

        g.    On or about August 3, 2020, after the Buyer's Group failed to provide KYC documentation, CONSTANT messaged Sellers' Broker-2:

> Do these guys understand I'm having to report all these SBA deals
> as Fraud, because they can't get paperwork to me?

Sellers' Broker-2 agreed, stating, in substance and in part, "yea bro we have no other choice at this point but to protect ourselves."

    16.    Records that I have obtained from Bank-1 and Bank-2 for the C2 Accounts show that none of the proceeds of the Fraudulent SBA Loans was sent to the Purported Farm Borrowers.

    17.    I have communicated with SBA representatives and learned the following:

        a.    None of the Fraudulent SBA Loan proceeds have been returned or repaid to the SBA.

        b.    On or about September 15, 2020, the supposed owner of one of the Purported Farm Borrowers ("ID Theft Victim-1") called the SBA, after receiving a letter from the SBA about the Fraudulent SBA Loan issued to her purported farm. ID Theft Victim-1 stated, in substance and in part, that ID Theft Victim-1 does not own a business, had not applied for an SBA loan, and was the victim of identity theft.

    18.    Other HSI agents and I have spoken with ID Theft Victim-1 and the supposed owners of five other Purported Farm Borrowers. All of them stated, in substance and in part, that they never applied for an EIDL from the SBA and did not operate a farm.

## CONSTANT STOLE AND LAUNDERED THE BALANCE OF
## THE FRAUDULENT SBA LOAN PROCEEDS

    19.    As discussed above, despite his August 3, 2020, message, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, did not report the Fraudulent SBA Loans as fraud and did not return to the SBA the loan proceeds that he still possessed. Records that I have obtained from Bank-1 for the C2-Bank-1 Accounts show that, as of on or about August 3, 2020—the date CONSTANT expressly acknowledged that the Fraudulent SBA Loans

9

involved fraud—the balance in the C2-9705 Account was approximately $200,000, and the balance in the C2-9580 Account was around $138,400, for a combined total of more than $338,400.   Except for an aggregate of about $515, both balances were from the Fraudulent SBA Loans.

20. As detailed below, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, used a portion of the balances to finance his company Coindawg and to pay other expenses, and transferred the rest to other people, including individuals associated with Sellers' Broker-2 and other co-conspirators.   In so doing, CONSTANT moved the funds among different fiat and cryptocurrency accounts.   Based on my training and experience, I believe that some or all of those transfers had no legitimate business purpose, but rather constituted a practice known as "layering," designed to further obscure the source of the funds.

21. Based on records from Bank-1, Bank-2, Exchange-1, a certain armored truck company (the "Security Company"), and a certain vendor of Crypto ATMs (the "ATM Vendor"), I have learned that CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, used a portion of the proceeds from the Fraudulent SBA Loans to finance Coindawg. In particular:

a. On or about August 6, 2020, just three days after expressly acknowledging that the Fraudulent SBA Loans involved fraud, CONSTANT opened the C2-8750 Account at Bank-2.   Several weeks later, in or about late September 2020, CONSTANT wired $23,000 from the C2-9580 Account to the C2-8750 Account, and then used approximately $10,400 from the C2-8750 Account to buy three Crypto ATMs for Coindawg.

b. Between in or about October 2020 and March 2021, CONSTANT transferred approximately $98,300 from the C2-9580 Account to Constant's Exchange-1 Account.   Using Constant's Exchange-1 Account, CONSTANT, among other transactions:

  i. bought approximately 0.08 BTC (equivalent to approximately $3,250), which he used to purchase one more Crypto ATM for Coindawg; and

  ii. bought approximately $2,100 worth of bitcoin for certain Coindawg promotional expenses.

c. On or about December 28, 2020, CONSTANT wired $30,000 from the C2-9705 Account to the C2-8750 Account, and then used approximately $9,750 from the C2-8750 Account to buy another three Crypto ATMs for Coindawg.

d. Between in or about mid-June 2021 and end of October 2022, the Security Company picked up over $3,000,000 in cash, originating from one or more Crypto ATMs, which was sent via ACH transfers to the Coindawg-5403 Account.   During that same approximate period, the Coindawg-5403 Account transferred roughly $2,300,000 to Coindawg's Exchange-1 Account.   And between in or about September 2021 and May 2022, CONSTANT reinvested an aggregate of more than $39,000 to purchase thirteen more Crypto ATMs, at least nine of which were paid for from Coindawg's Exchange-1 Account.

e. Based on my training and experience, I believe that a substantial portion of the $2,300,000 transferred to Coindawg's Exchange-1 Account was used to buy more cryptocurrency, predominantly bitcoin, from Exchange-1, in order to perpetuate Coindawg's cryptocurrency exchange business. My belief is supported by Exchange-1 records which show that most deposits from the Coindawg-5403 Account were quickly followed by one or more purchases of bitcoin equivalent to a substantial portion of the deposit. For example, on or about July 19, 2021, the Coindawg-5403 Account wired $19,000 to Exchange-1. That amount was credited to Coindawg's Exchange-1 Account. It was immediately deducted from Coindawg's Exchange-1 Account. Then, between July 21, 2021, and July 26, 2021, Coindawg's Exchange-1 Account received approximately $19,000 worth of bitcoin. Those bitcoin deposits were followed by numerous transfers of smaller quantities of bitcoin from Coindawg's Exchange-1 Account to multiple other bitcoin wallets, consistent with the operation of a retail cryptocurrency exchange business.

22. From reviewing Coindawg's website, I have learned that its Crypto ATMs are located in Texas and Oklahoma. In addition, an HSI agent who conducted an undercover purchase of bitcoin from one of Coindawg's Crypto ATMs informed me that the ATM machine accepted cash only and that Coindawg charged a 15% transaction fee.

23. Based on my review of Bank-1 records, I have learned that in addition to the transactions described above, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, transferred the remaining Fraudulent SBA Loan funds in the C2-9705 Account to, among others: the C2-9580 Account; one or more individuals associated with Sellers' Broker-2's father; Exchange-3; and multiple law offices. By in or about the end of December 2021, the entire balance in the C2-9705 Account was depleted.

24. Based on my review of Bank-1 records, I also have learned that CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, transferred the remaining Fraudulent SBA Loan funds in the C2-9580 Account to, among others: a health insurance company; Exchange-3's account at Bank-4, including a $20,000 wire on or about May 27, 2021, among others; other C2 Accounts; and various vendors. By in or about early March 2021, a balance of only $6,800 remained in the C2-9580 Account.

25. Finally, my review of Bank-2 records has revealed that, in or about late February 2021, CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, wired $15,000 from the C2-8750 Account to Exchange-3's account at Bank-4.

WHEREFORE, deponent prays that an arrest warrant be issued for CHARLES RILEY CONSTANT, a/k/a "Chuck Constant," the defendant, and that he be imprisoned or bailed, as the case may be.

/s authorized electronic signature
_____
JASON S. SAMUELS
Special Agent
Homeland Security Investigations

Sworn to before me this
__20_ th day of March 2023

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK